Stedman *v.* Feidler.

A part owner of a ship who has dissented from, and refused to participate or be concerned in, the running, use or employment of the ship, or to share in the expense of such running by his co-owner, who is notified of such dissent, is not liable to third persons for supplies furnished by them to the managing owner while running the ship; they having no notice, at the time of furnishing the supplies, either of the dissenting owner's interest in, or his dissent from, the use of the ship.

The power of one part owner of a ship to bind another, depends upon the question of *authority*, which is always a mere question of fact. The presumption of authority, arising from joint ownership, may be rebutted by proof of any fact which is inconsistent with the existence of such authority.

If one joint owner dissents from the running or use of the vessel, and gives notice to his co-owner that he refuses to be concerned therein, in future, or to share in the expenses thereof, this amounts to a revocation of the managing owner's authority, and the dissenting owner will not be liable for supplies for the vessel afterwards ordered by the managing owner.

APPEAL from a judgment entered on the report of a referee. Eli Hart, the intestate, died on the 31st of December, 1845, and was then the owner of one-seventh of the steam boat De Witt Clinton. At the time the supplies hereinafter mentioned were furnished by the plaintiffs, the defendant Feidler, as administrator of Hart, owned one-seventh, and one Wing owned the other six-sevenths of the steam boat. After Feidler's appointment as administrator, and in December, 1846, he made inquiry in relation to this steam boat, and requested his agent at Buffalo to sell his interest in her. She was run in 1846 without the direction, control or interference of the defendant Feidler, and in Februa-

ry, 1847, he received $1000 as a portion of her earnings in 1846. On the 12th of October, 1849, he received $147.44, and on the 26th of December, 1849, he received $36.26, which was paid him as part of the earnings of the boat during the season of 1847. The boat was run by Wing, as part owner, during the years 1847, 1848, 1849, 1850 and 1851, Wing acting either as master or clerk and in such capacity running thereon. In the year 1851, from the 6th of April to the 14th of November, the plaintiffs sold and delivered meats and provisions to the steam boat, upon the orders of the steward and cook, of the value of $347.89, and have since received in part payment $245, leaving a balance due them of $102.89. Several of the payments made on the account were made by Wing, who knew that the plaintiffs were furnishing the boat, and who promised, after the supplies had been furnished, to pay for them. The supplies were necessary for the boat, and the master knew that the plaintiffs were furnishing them. The plaintiffs lived in Cleveland in 1850 and 1851, and for several years previous, and had been engaged in the business of furnishing vessels. The defendant Wing during that time resided at Monroe or Toledo, and was well known at Cleveland, and other ports on Lake Erie. Hart and the defendant Feidler lived in New York city for several years prior to the death of Hart, and Feidler has since continued to reside there. The defendant Wing was on the steam boat as master or clerk, when she was running, from 1849 to 1852 inclusive, and the boat was accustomed to stop at Cleveland every trip during those years. It was there understood that Wing had the entire management of her, and was a part owner. The defendant Feidler considering that he had no authority, as administrator, to direct or participate in the direction of the running of the boat, and that his duty was to sell and dispose of the interest of Hart therein as soon as the same could properly be done, uniformly directed his efforts to effect such sale. He never consented to, or took, directly or indirectly, any part in the running of said steam boat or in incurring any bills or expenses in relation to her, and whatever was done with her, as to her management or the creation of such bills, was done without his knowledge, in-

Stedman *v.* Feidler.

formation or consent, except as hereinafter stated. In the spring of 1849, he told the defendant Wing that he would have nothing to do with the running of said boat, or in paying any expense or indebtedness of her running, and would have nothing to do with the business or concerns of the said steam boat, or with the boat itself, except to sell his interest in her if he could. This evidence was taken subject to the plaintiff's exception. In October, 1852, the attorney for the plaintiffs called on the defendant Feidler in relation to the bill of the plaintiff and other bills against the steam boat, and to see if Feidler would pay those bills. Feidler then told said attorney that he held or owned one-seventh of said boat; that he had paid $2000 for her and should not pay any more until the claims were legally proved. After this suit was commenced and after the steam boat had been sold, and about 1853, the defendant Feidler directed his attorney at Buffalo to commence a suit for the earnings of the boat. He had before paid accounts against her, and taken assignments of the claims by the advice of his attorney.

On these facts the referee decided, as a question of law, that neither the defendant Wing, the master, steward or clerk of the said steam boat had any authority or direction from the defendant Feidler, either express or implied, to contract for or procure the said supplies, or to bind the defendant Feidler, as such administrator, therefor. Judgment was entered for the defendant Feidler on the report, and the plaintiff appealed to this court.

*A. P. Laning,* for the appellant.

*S. S. Rogers,* for the respondent.

*By the Court,* GREENE, J. This case presents the question whether one part owner of a ship, who has dissented from, and refused to participate or be concerned in any manner, in the running, use, or employment of the ship, or in the expense of such running, by his co-owner, who is notified of such dissent, is liable to third persons for supplies furnished by them, to the managing owner while running the ship, they having no notice,

Stedman *v.* Feidler.

at the time of furnishing the supplies, either of the dissenting owner's interest in, or his dissent from the use of the ship.

As a general rule, one part owner may bind the others for necessary supplies and repairs for a ship, procured on credit, and render his co-owners liable to be sued for the price of them, unless their liability is expressly provided against by the agreement between the contracting owner and the material man. The master, with some exceptions, which it is not material to mention, has the same authority to bind the owners. (*Abbott on Shipping*, *6th Am. ed.* 105.) To this general rule there are some exceptions. One important one, which is well established by the authorities, arises where the party in possession of the ship, whether a part owner, mortgagee or charterer, has the exclusive control and management of, and runs her at his own expense and for his own benefit. In such a case the party in possession is exclusively liable for supplies and repairs procured on credit. He is regarded as the owner while his interest and control continue, and the general or legal owner is absolved from all responsibility for the expenses of the ship, whether the party supplying or repairing her has notice of the relations between the owner and the party in possession or not. (*Reeve* v. *Davis,* 1 *Adol. & Ellis,* 312. *Jennings* v. *Griffith, Ryan & Moody,* 42. *Briggs* v. *Wilkinson,* 7 *Barn. & Cress.* 30. *Cutler* v. *Shuls,* 20 *Maine R.* 213.)

As between part owners, those owning a majority in interest have the right to control the use of the ship, and the owner of a minority interest who objects to the employment of the ship in any particular adventure, or generally, by his co-owners, may arrest her by process of the admiralty and compel them to give him security for her safe return or to pay him the value of his interest, in which case the minority owner will not be entitled to share in the profits or be liable for the expenses of running the ship. Subject only to this right of the minority owner, the majority owners have unlimited control over his interest. They may at all times employ the ship as they please without consulting him, and in case of his dissent, for their own exclusive use and profit. In addition to this, it is now claimed that the

Stedman *v.* Feidler.

majority owners may pledge the credit of the dissenting minority owner at their pleasure, and in defiance of his clearly expressed will. Expressed in fewer words and plainer English, the position of the minority owner, according to the present definition of his rights and liabilities, is this, he is liable to have his property, without his consent, used by others and *for their exclusive benefit*, while he stands responsible in *solido* for all debts that they may incur respecting it, in the course of such use; being thus subjected to the risk of an adventure which he has had no agency in projecting, and of the improvidence and ultimate bankruptcy of those over whose acts he has no control. This is certainly an extraordinary responsibility, and if it is to be judicially recognized, it must be because the rule upon which it rests, is too firmly established by authority to be considered upon principle, or because it is justified by some principle necessarily resulting from, and applicable to, the peculiar nature of the property and the relations to it and to each other, of those who are joint owners of it.

There are but few cases bearing directly upon the point in controversy, but I think there are enough, when carefully considered, to settle this question, not merely by force of arbitrary authority, but what is more satisfactory, to develop and illustrate the precise legal reason upon which the liability of ship owners upon the contracts of their masters, and the liability of joint owners upon the contracts of their co-owners, rests.

The case of *Hardy* v. *Sproule and others,* decided in the supreme court of Maine, in 1848, (16 *Shep.* 434,) was an action brought to recover the plaintiff's wages as a mariner. The services were performed on board of a vessel owned by the defendant and one Joseph P. Hardy, who owned three-fourths of her. The master hired the plaintiff on the credit of the owners. The master had commanded the vessel for two seasons previous. Before the plaintiff rendered his services, the defendant forbade the master and the other owner having any thing to do with the vessel. The court held the defendant liable. The sole reason rendered by the court was, that the plaintiff had no

knowledge of what had passed between the defendant and the other owner and the master. No authority was cited upon this point by the court or by the counsel on the argument.

The case of *Skolfield* v. *Potter and others*, (*Davies' R.* 392,) was a libel in *personam* for seamen's wages, filed against the owner of the vessel who, by a parol agreement, had let her to the master. The master was to have control of the vessel, to employ her as he chose, to victual and man her at his own expense and to pay the owner one-half of her gross earnings, deducting one-half of the port charges. It appeared that the respondents had received about $1100 of the freights of the vessel earned during the time of the libelant's service, and held the freight money at the time the libel was filed. Wall, district judge, after some criticism upon the terms of the contract for hiring the vessel, admitted that according to the weight of authority, it was to be regarded as a charter of the vessel, and that as a consequence of that fact the general owners would be absolved from liability upon the master's contracts for supplies and repairs. The doctrine of *Rich* v. *Coe*, (*Cowp.* 636,) to the contrary, was cited with approbation by the learned judge, but he admitted that the current of judicial decisions was in favor of the rule exempting the general owner from liability in such cases. "But," the learned judge remarked, "no decision has gone so far as to relieve them from their liability for seamen's wages. The seamen have always this triple security besides a direct hypothecary interest in the freights; and in all ages of the maritime law their claim for wages has been highly favored, both on the ground of general commercial policy and from the consideration of their own habits of carelessness and characteristic improvidence. They habitually enter into their engagements in reliance on these securities, and they ought not, on principles of public policy and national justice, to be deprived of them by any refined and subtle distinctions so alien from all their habits of thought and action." Upon this reason, peculiarly and exclusively applicable to this class of creditors, as well as upon the ground that the respondents had received freight carried by the libelant, upon which he had a lien by the maritime law, the learned judge sustained

the libel. The doctrine that the general owner, when the vessel is under the control of another, who runs it for his own profit and at his own expense, is absolved from liability for supplies and repairs, is fully recognized.

In the case of *Brodie* v. *Howard*, decided in the English common pleas, in 1855, (84 *C. L. R.* 109,) the action was brought to charge the defendant as part owner of the ship Stratheden, for work done by the plaintiff, a ship builder, on the vessel, between the 29th of August and the 4th of December, 1852, which repairs had been ordered by one Lewis, who was the defendant's co-owner, and superintended by the captain. On the trial it appeared that the ship arrived in London from a voyage on which she had been absent between two and three years, very much out of repair; that on her arrival Thompson & Co., who had for several years acted as the ship's brokers, by the direction of Lewis (who had always acted as her managing owner,) and who was registered as owner, he being the owner of fifty-six sixty-fourths, and the defendant being owner of the other eight sixty-fourths, sent her to the plaintiff's dock for repair. *The order for the repairs was given by Lewis.* Immediately after the ship's arrival and on the 3d of June, 1852, the defendant wrote Lewis and informed him that it was not his intention to sail her again, and asked Lewis to purchase his shares, to which Lewis agreed, but the arrangement was not ultimately carried into effect. The defendant, on learning that Lewis was getting the vessel ready for another voyage, and incurring expense for repairs, gave the plaintiff notice on the 10*th of September*, that he would not be responsible for them. The repairs were commenced on the 29*th day of August*. On the 20*th day of September*, the defendant caused the ship to be arrested by the process of the court of admiralty, and obtained the usual security, to wit, for the value of his interest minus the value of the repairs. For the plaintiff it was insisted that the defendant, as one of the registered owners, was, under the circumstances, liable for all the repairs, or, *at all events, for those incurred prior to the date of the notice.*

Under the direction of the lord chief justice, a verdict was

found for the defendant, leave being reserved to the plaintiff to move that a verdict be entered for him for the full amount of the repairs, *or for such other sum as the surveyor might, under the direction of the court, find to be due to him from the defendant.* A *rule nisi* having been accordingly obtained in the Easter term, the argument was suspended for the decision of the case of *Mitcheson* v. *Oliver,* then pending in the exchequer chamber, and involving the same question of law. That case having been decided, this case was brought to argument ; and it was held by the whole court that the notice by the defendant to Lewis, of his intention not to run the vessel any more, terminated Lewis' authority as part owner to bind the defendant for any expenses incurred for the ship. Jervis, C. J., said : " I think it is now perfectly well understood that these and all similar cases depend on the question, *with whom was the contract made,* and that again depends upon the question of *principal and agent,*—was the party who gave the order for the repairs *the agent of the party sought to be charged ?*" The lord chief justice then proceeds to consider the legal position of " part owners" of vessels, and after remarking that they *may* be partners generally, or partners in a particular adventure, but that they are not necessarily, (and he might have added not as a general rule) partners, he proceeds to say : " A part owner, therefore, has not a general authority to bind his co-owners ; but the liability of a co-owner may result either from express authority or by implication ; for instance, he may so conduct himself as to have held himself out to the party contracted with, as one upon whose credit the work was to be done, as might have been the case here, if it had been shown that the ship had been previously in Mr. Brodie's dock, sent there by Lewis, the managing owner, and repaired upon the joint credit of Lewis and the defendant. In that case the ship being sent there again by Lewis' order, the presumption would be—unless he proved an express determination of Lewis' authority or agency—that the defendant would be liable as having held himself out as a person to be bound by the acts and contracts of Lewis, in relation to the ship. But the moment the

Stedman *v.* Feidler.

authority is determined you * * are entitled to look to the real circumstances and position of the parties, to see whether or not the person who gave the order, was in reality the agent of the party sought to be charged." After referring to the notice from the defendant to Lewis and the answer of Lewis, the learned judge says : " from that moment any orders given by Lewis cease to be given by the defendant's authority. When, therefore, you look to the real transaction between the parties—as it is admitted you may do—you find a distinct intimation on the part of the defendant of an intention to countermand the *prima facie* authority of Lewis, and, therefore, his right to make contracts to bind his co-owner is at an end." The case at bar was considered by the learned judge to be analogous in all respects to the case of *Curling* v. *Robertson,* 7 *Man. &amp; Gr.* 336, (49 *Eng. Com. Law R.*) which will be hereafter noticed. And that case was held to be in point. The authority of Lord Tenterden's rule, as laid down in Abbott on Shipping, p. 105, having been urged upon the court in the argument of that case, as it was urged upon us in this case, the learned judge said, " the case put by Lord Tenterden, I take to mean this, that where a ship goes into dock for the purpose of repair upon the general credit of the owners, and one of them either legally or in fact ceases to be a part owner, he may continue liable together with the others, for the work done upon her, unless he determines his liability by express notice to the tradesman. But, *when there is no such holding out* there can be no necessity for notice, *inasmuch as the liability never attached.* If I am a part owner jointly with two others, in equal shares, and I send the vessel into dock, *unless my co-owners have by notice limited my authority,* if any, I am only incurring a liability to the extent of one-third. Therefore, I think the explanation of Lord Tenterden's doctrine is this, that the authority of a part owner to charge the credit of the others for necessary repairs exists, and continues only *until countermanded,* he is entitled *until he has notice to the contrary,* to assume that he has authority to bind them, and a tradesman to *whom a part owner has been held out as having such authority* may in like

manner assume it to continue until he has express notice that the authority has ceased."

The case of *Curling* v. *Robertson* was this : Previous to June, 1840, the defendant, her brother, William Robertson, and one Bishop were registered owners of the ship Ferguson. The defendant owned ten sixty-fourths ; William Robertson, twenty-three sixty-fourths, and Bishop thirty-two sixty-fourths. About the first of June, William Robertson, for himself and as agent for the defendant entered into a contract with one Virtue for the sale of his own and the defendant's interest in the ship. A bill for $1000 was drawn by W. Robertson on Virtue, and accepted by Bishop for the honor of Virtue. The contract for the sale of the interests of the Robertsons was negotiated by Bishop on behalf of Virtue, and there was a verbal understanding that Virtue's brother should have the option, on becoming of age, of taking the ten shares. On the 9th of September, William Robertson, by a bill of sale dated the 13th of July previous, transferred his shares to Virtue, and on the same 9th of September, the defendant, by a bill of sale dated the 18th of August previous, transferred ten shares to Bishop. After the contract made by William Robertson for the sale of his own and the defendant's shares, but before the execution of the bills of sale, the plaintiff did repairs upon the ship upon the orders of Bishop, who acted as managing owner or ship's husband. The defendant was not known to the plaintiff as a part owner, at the time of the repairs, nor had she ever interfered in the matter. The lord chief justice, (Tindal,) left it to the jury to say whether the defendant, *at the time the repairs were done, had parted with her beneficial interest in the ship,* and whether the bill of sale to Bishop was a *bona fide* carrying out of the previous contract, and charged that if they found in the *affirmative on both points,* they ought to return a verdict for the defendant. The defendant had a verdict, with leave for the plaintiff to move to enter a verdict for him. On the hearing upon the rule to show cause, the court held that the charge at *nisi prius* was correct. The lord chief justice said : " I think this case falls within that class of cases in which the

legal owner of a ship having parted with his beneficial interest, the question arises whether the party giving an order for repairs had any authority to do so from such owner. In this case there is no evidence to show that Bishop had any such authority." After referring to the contract of sale and the subsequent transfers in pursuance of it, the learned judge says: " It is clear then, *that from the month of June, when the contract of sale was entered into, the defendant had parted with her beneficial interest* in the ship, and had no right to any profit accruing therefrom, consequently she was not liable for these repairs which were ordered by Bishop after the contract of sale had been made  *  *  although the legal ownership is *prima facie* evidence of liability, it may be rebutted by proof of the beneficial interest having been parted with, and of the legal owners having ceased to interfere with the management of the ship." The whole court was of this opinion.

The case of *Mitcheson* v. *Oliver*, reported in 32 *Eng. L. and Eq. Rep.* 219, was an action for repairs done by the plaintiff on the ship Progress, between the 10th day of October and the 17th day of November, 1852. The defendant was and had been the sole owner of the ship since the 25th day of July, 1850. She was duly registered in that month as a British ship, in the name of the defendant as sole owner, and the defendant ever since that time to the time of the trial, continued the sole registered owner, and without any entry of any change of ownership having ever been made on the register. One Christie had been appointed by the defendant and acted as his master from the 7th of August, 1850, to the 14th of September, 1852. On the latter day the name of one Thompson was inserted in the register as master of the ship as hereafter stated. On the 14th day of July, 1852, the defendant entered into an agreement with one Gompertz for the sale of the ship to him. The ship was to be fitted at the expense of the defendant so as to be classed " A, 1." On the 4th day of September, after the making of this agreement, the defendant's agent, by his direction, put the ship into the East India docks, and notified the vendor's agents, appointed by him for that purpose, that the ship was safe in the docks, and was at the risk

and expense of the vendee. About this time the defendant's agent found Captain Thompson on board, and received from him a letter from the said agents of the vendee, notifying him that Thompson was appointed to the command of the ship. The defendant's agent also took from Thompson a receipt for the ship "as per contract." A contract was entered into on the 1st day of September, between the defendant's vendee and Thompson, by which the latter was employed to sail the ship as master. On the 13th day of October, the certificate of the ship's registry with the name of Thompson indorsed thereon as master, was taken to the office of the registrar general and the appointment of Thompson was entered in the register. This certificate had been delivered to the agents of the vendee at their request, and for the purpose of having the ship entered by him. The certificate was subsequently sent to the defendant's agent, who testified that on receiving it, he did not notice the fact that the appointment of Thompson as master had been entered in the register, and that he did not know it until about a month afterwards, and there was no evidence that the defendant was informed of it. One of the plaintiffs examined the register after this change, and about the time the repairs were commenced. After Thompson took possession of the ship, he ordered the repairs in question, and the evidence tended strongly to show that the defendant had never ordered any of the repairs or interfered in any manner with them, but it was proved that ship-keepers appointed by him, were on board at the time. In the month of November, the contract of sale not having been consummated, the defendant resumed possession of the ship. Lord Campbell charged the jury that the defendant would not be liable to the plaintiff's demand merely as owner of the ship nor by reason of his being registered as such owner, nor would he be liable merely by the orders being given to the plaintiffs by the registered master of the ship; but that the defendant would be liable if he remained in possession of the ship and held himself out as owner, and if Thompson acted as master of the ship with his privity and consent, and the supplies were furnished upon the credit of the owner and were fit and necessary, &c. The court of ex-

Stedman *v.* Feidler.

chequer chamber held this charge erroneous, although in a subsequent part of his charge the chief justice put the general question to the jury upon the whole evidence, whether the defendant had authorized the supplies to be furnished on his credit and they had in fact been so furnished. In connection with this part of his charge the chief justice stated that in his opinion there was evidence on which the jury might find a verdict for the plaintiff, and that although the facts given in evidence by the defendant were believed, he *was not conclusivsly entitled in point of law* to a verdict. Park, B., delivering the opinion of the court, said, " In cases such as this all questions as to liability for the repairs of a ship *will depend upon the authority to make the contract,* the owner never having represented that the captain had such authority." The learned judge, after expressing the opinion that the verdict could not be sustained upon the facts proved, proceeded to consider the charge of the chief justice, and to state that part in which the jury were instructed what facts would make the defendant liable, with the following comments : " He said the defendant would be liable if he remained in possession of the ship"—that is not enough, "and held himself out as owner"—that is not enough, because the owner, as owner, is not *necessarily* liable for the contracts of the master ; "and if Thompson acted as master of the ship with his privity and consent"—that is not enough, unless Thompson acted as HIS master. " If he acted as master of the ship with his privity and consent, that is tantamount to a general authority to act on his behalf," therefore the lord chief justice added, " and if the goods and work were supplied and done to the ship upon the credit of the owner, by the *bona fide* orders of the master, given with the privity of the owner, and if the goods and work were fit, necessary and proper for the ship under the circumstances in which she was placed, and fit and necessary for the ship at the time of the orders," that then he would be liable. Now it is not true if all these circumstances concurred that a person who had the legal title to the ship would be liable ; they would not be enough *if he never held him out as his master* of the ship acting on his behalf, in the conduct, management and direction of

the ship, and ordering the repairs." The learned judge then proceeded to consider that part of the charge of the chief justice in which he stated that there was evidence upon which the jury might find for the plaintiff, and that they would consider whether upon the evidence adduced, and the direction they had before received, the defendant had not made himself originally liable, and remarked " that is true, because they might draw the inference from the possession, or they might believe the wit- nesses for the plaintiff." Then the lord chief justice goes on : " whether the defendant had authorized the order was a question of fact for the jury, undoubtedly. That although the facts given in evidence by the defendant were believed, he was not conclusively entitled in point of law to a verdict." We think that part of the summing up objectionable ; for there being nothing but *prima facie* evidence—and no evidence at all to show that the defendant had ever represented the matter otherwise than appears, or had held out that Thompson had power to contract for him, the question resolves itself into this, *whether Thompson had authority ;* and therefore the lord chief justice ought to have told the jury, that if they believed the evidence for the defendant, they ought to find a verdict for the defendant, as there was no actual authority given, and the evidence disproved that there was any." Justices Maule, Caswell and Crowder, and Alderson, Platt and Martin, barons, concurred in this opinion.

It seems to me clear from the reasoning and authority in these cases, and as the result of general reasoning from conceded premises, that the power of one part owner of a ship to bind another and the power of the master to bind the owners, depends in all cases upon the single question of authority, which is always a mere question of fact. The general rule already stated, that one part owner may bind the others for supplies and that the master may bind all the owners, is but the result of the application of a familiar rule of evidence to a fact. The nature and uses of the property, and the relations between the several owners in one case and between the owners and master in the other, are such as naturally to raise the presumption that such authority has been expressly conferred, and therefore from the unex-

Stedman *v.* Feidler.

plained fact of ownership, the further fact of authority, its usual concomitant, (which is sometimes termed implied authority,) is *inferred.* It will be easily seen on reflection, that the acknowledged exception to the rule as applicable to the relation of owner and master, by means of which the owner is absolved from responsibility, where the ship is run under a charter and at the sole risk and expense of another, depends upon the same question, rests upon the same reason, and can be justified by no other. When in answer to the proof of ownership from which the master's authority to bind the owner is inferred, the owner proves a charter by which he has surrendered the entire control of the vessel to another who runs it for his own profit and at his own risk and expense exclusively, the presumption of authority is conclusively rebutted, the effect of the *prima facie* evidence of authority is entirely overthrown. The same result follows whenever the authority which is presumed from ownership, is disproved by any other fact wholly inconsistent with the presumption of authority, as in the two cases last cited, where the repairs were done and supplies furnished after agreements on the part of the defendants to sell, and on the orders of the vendee exclusively. In the case of *Curling* v. *Robertson,* the agreement was subsequently executed, but not until after the repairs were made. In *Mitcheson* v. *Oliver,* the agreement was never executed, and the title was, during all the time that the repairs were in progress, in the defendant; and he resumed possession of the ship after the repairs were made. In these cases, the court attached no importance to the contracts of sale, except that they were regarded as evidence upon the question of authority. In the case of *Brodie* v. *Howard,* which I regard as an authority in point in this case, the mere fact of the defendant's dissent, or notice to the managing owner that he did not intend to run the vessel any more, was held to be a full and perfect revocation of the managing owner's authority, and the defendant was held not to be liable for repairs afterwards ordered by the managing owner. The notice to the plaintiff in that case and the proceeding in admiralty abate nothing from the authority of the decision as applicable to this case. The repairs had been commenced and

partly completed before either the notice was given or the pro-
ceedings were commenced, and the court held that the defendant
was not liable for the repairs that had been done before those
acts of the defendant. The unexecuted agreement for the sale
of the defendant's interest to his co-owner was entirely disre-
garded. As in *Mitcheson* v. *Oliver*, it was evidence upon the
question of authority, but in that view it was wholly unimportant,
as the defendant's notice was conclusive upon that question. In
short the decision was put wholly upon this fact of notice. It
seems to me impossible to evade the point of that case, to parry
its application to this case, or to resist the force of its reasoning
and authority. I think, therefore, that it is clear upon authority,
that the fact of ownership, which the plaintiff supposes is con-
clusive upon the question of the owner's liability in such cases,
is of no importance except as evidence of authority. As such
it is *prima facie* evidence only, and may be rebutted not merely
by disproving the *fact of ownership*, but by proof of any other
fact wholly inconsistent with the existence of such authority.

I think it is equally clear upon principle that this liability for
supplies furnished to ships does not rest upon the presumption
that, in the absence of a special agreement by which the credit is
given to a particular party, the material man trusts to the credit
of the owner. If this was so, the owner, *as such*, would be liable
in all cases, as well when he had entirely surrendered the pos-
session and control of a ship under charter party, as when it
was run on his account. The assumed reason for the liability
is as applicable to the first case, as to a case where by any other
means, the owner has surrendered the possession and ceased to
interfere with the management and control of the ship. In the
absence of any special agreement, and when the material-man
deals with the master without inquiry, he may and is presumed
to rely upon the credit of every person for whom the master has
authority to contract. His claim upon such persons is a matter
of strict right. It is founded upon his contract with the master,
which is the contract of his principals, and not upon a supposed
credit given to an unknown party to whose credit the material-

Stedman *v.* Feidler.

man would be quite as likely to trust if he was the charterer as if he was the owner of the ship.

I can see no reason founded in commercial policy upon which this unlimited liability of ship owners can rest. In addition to the ordinary remedies which the law gives to all creditors, a party who furnishes or supplies a ship has, by the maritime law, a lien upon her which he may enforce *in rem*, wherever the ship can be found, even as against a *bona fide* purchaser. If not satisfied with this security, the creditor may require the master to hypothecate not only the ship but the freight, and to stipulate by a bottomry bond for the payment of extraordinary interest. All this the master has authority to do, and his acts are valid as against the owner though the ship may be running under a charter party. This liability of the owner to have his property affected by the acts of others, like his liability to have it controlled and used by others without his consent, is one of the incidents of a title to this kind of property. But I can see no reason, founded either in the nature of the property, its particular employment, or the relations of the parties interested in it, which requires that the liability of the owner should be extended beyond this without his authority.

Great importance has been attached in this case to the fact that no notice to the plaintiff, of the dissent of the defendant to the running of the boat on his account, was proved. The case of *Hardy* v. *Sproul*, is the only authority that has been cited on this point, and as I have before observed, no authority was cited in that case by the court or the plaintiff's counsel in favor of that proposition upon which the decision was based. The case is opposed to the authority of *Brodie* v. *Howard*, *Curling* v. *Robertson*, and *Mitcheson* v. *Oliver*, and to many other cases in which the owner's liability has depended upon the question of who was the owner for the voyage. I think that case cannot be sustained. In neither of the three cases last cited, was there any notice to the plaintiff. In all of them the defendants were not only the registered owners, but the owners in fact, so far as the legal title was concerned, and in *Mitcheson* v. *Oliver*, the plaintiff, before the commencement of the repairs, consulted the

register, from which it appeared that Oliver was the owner, and Thompson, who ordered the repairs, was the master.

But in all of those cases this question was thoroughly considered, and it was held that in the absence of any representation or "holding out" by the owner, which was calculated to influence the plaintiff's action or induce him to rely upon the credit of the defendant, the right to recover depended upon the naked question of authority, and that the fact of notice was wholly immaterial. This must be so, upon principle. We have seen that the master has, by virtue of his position, authority to bind the owners, or the persons under whose direction and on whose account the ship is running, where the title is in one party and the temporary control of the ship in others. Those who trust the master have a right to do so on the credit of such persons whoever they may be; and the right to recover in every case, depends upon the question whether the party sued occupied the relation to the master upon which the liability rests. If he did not, and has not so held himself out to the public, or done any act by which the plaintiff has been misled, he cannot be made liable. If this was not so, there would be no practical limit to the responsibility of a party who had once appointed an agent; for, according to the rule contended for, after the agent's authority has been revoked, a third person may trust him on the credit of his assumed principal, and hold the principal liable on proving that an agency once existed, and that he has had no notice of its revocation, and this though the party so trusting may never before have heard of the pretended agent or principal or the authority upon which the agent assumes to act. This would be the necessary result of the application of the rule in question to this case. The obvious answer to it is that persons who have not, during the continuance of the agency, dealt with the agent on the credit of the principal, are not entitled to notice. They trust solely to the representations of the assumed agent and must abide by the consequences of the fact, whatever it may be.

What is the result of the application of these principles to the facts of this case? The defendant being the owner, in his representative capacity of one-seventh of a steam boat, gave the owner

Stedman *v.* Feidler.

of the other six-sevenths, who was her managing owner, notice that he would have nothing to do with the running of the boat, with its business or with the boat itself, and that he would not pay any of its expenses or debts. This was in 1849. Previous to that time the relations of the defendant, and Wing, as co-owners, were such as, between themselves, to confer authority upon Wing to bind the defendant by contracts for supplies and repairs for the boat. What was the effect of this notice? I think it was clearly a revocation by the defendant of all Wing's authority to bind him thereafter by such contracts, or in any matter relating to the boat. I can see no substantial difference between the defendant's legal position from that time, and that of a part owner who has chartered his interest to his co-owner, and thereby surrendered all his control over and severed all his connection with the boat and its business. The only difference between the two cases is, that in this case Wing has the use of the defendant's share without compensation, but that difference is certainly a very poor reason why the defendant should still be held liable for Wing's debts, thereafter contracted. In *Horn* v. *Gilpin*, (*Ambler*, 255,) one part owner freighted and sent a vessel on a voyage to which the other owner objected, and in which he refused to participate. The vessel was lost and the owner who had sent her on the voyage, filed a bill to compel the dissenting owner to contribute to the loss. But the court held that he was not bound to contribute, for the reason that he was not entitled to share in the profits of the voyage. Why was he not so entitled? Clearly because he refused to participate in the risk and share the expense of the voyage. In this case, from the moment that the defendant refused to share in the expense of running the boat, he had ceased to be entitled to share in its earnings; and Wing, by virtue of his position as controlling owner, became entitled to run the boat at his own expense and for his own profit. These rights result, as we have seen, from the nature of the property and the relations of the parties. The property is indivisible and cannot be severed, and if it cannot be employed in navigation it is useless and valueless to all parties; and therefore it is better that it should be used by those who are willing

Stedman *v.* Feidler.

to incur the risk of its use, to the exclusion from all control over it and participation in its earnings, of those who will not participate in those risks, than that it should "lie by the walls" and benefit no one.   The dissenting owner may, by a proceeding in admiralty, compel those who desire to employ the ship to give him security for its safe return or to pay the value of his share. But the rights and liabilities of the parties, so far as a title to profits and responsibility for expenses are concerned, do not, I take it, depend upon this proceeding, nor are they in any manner affected by it.   The object and result of the proceeding are to procure security for the dissenting owner's interest, and by neglecting to take the proceeding, he loses that security.   I am not aware that any decree is made in such a proceeding touching the rights of the parties, even as between themselves, except in relation to the possession of the ship and the amount of the security.  · Clearly no decree could be made which could affect in advance the rights of third persons, who might afterwards deal with the managing owner.   The decree, as a proceeding *in rem*, could affect nothing but the possession of the property proceeded against, and it could be binding *in personam* upon those only who were parties to it.   In *Horn* v. *Gilpin* no such proceeding was taken by the dissenting owner, and I do not see how the failure by the defendant to take that proceeding, can affect the question under consideration.

The supplies for which this action was brought were furnished by the plaintiffs more than two years after the revocation of Wing's authority by the defendant, who was not known to them until long after the supplies were furnished.   We have seen that Wing had no actual authority to contract for them on the defendant's credit, and there is no pretense that the defendant has done any act to mislead the plaintiffs or induce them to trust to his credit.

There is nothing in the suggestion that the defendant has paid bills contracted by Wing.   Those payments were made after the plaintiffs' claim accrued, and the most that can be said of them is, that they might be regarded as evidence against the defendant upon the question of fact, upon which his liability depends.

We are to presume that they were duly considered in that light by the referee, and as there is no complaint that his finding was against evidence, I think the judgment should be affirmed.

Judgment affirmed.

[ERIE GENERAL TERM, Sept. 8, 1856. *Bowen, Greene* and *Marvin,* Justices.]